We'll hear argument now on the case of One Wisconsin Institute v. Thomsen. Mr. Saitlin. Thank you, Your Honor. Misha Saitlin, Solicitor General on behalf of the State of Wisconsin. Before I begin my presentation today, I'd like to discuss the structure of the argument that myself and my colleague will present today. First, I will discuss Wisconsin's free ID system and the Western District's remedy. Then my colleague will discuss the rest of the issues in this case. Later today, I'll come back in the Frank case and discuss the Eastern District's remedy with regard to our free ID law. Wisconsin has created a comprehensive system that provides that every eligible voter can obtain a free ID with reasonable effort. For most voters who don't have photo ID already have all of the necessary documents to obtain a free ID with one trip. Counsel, why should we do anything with respect to the ID petition process other than remand to the district court? There is a moving target here. The state keeps changing its program. The state says its new program is working fine, and the plaintiffs say the new program is not working fine. Any reason why we should do anything other than tell the district court, sorry, what you addressed is no longer in place. Please go through the process for what's now in place. Well, I think that would certainly be a plausible solution. Now, I will note that at the time the trial was held, the rule that is currently the law was in place. That became in place on May 10th, and the trial was a very strange trial. The trial ended up with almost all the testimony being about what happened before May 10th and very little what happened after. One presumes that we need to make a judgment based on what now is in place and how it works. Your Honor, if the court were to do that kind of remedy, the state would welcome that. Now with regard to what the court did order, I'd like to talk about why if the court doesn't do that, why it should reject what the court did. Now, what our system currently is, is if someone comes to the DMV and they have all their documents, they'll get a free ID card good for eight years. If they don't have all their documents, they enter a special process. Now what happens there is if we can verify them quickly, then they'll get a free ID card in the mail within six days. If we can't verify them quickly, what happens is we'll send them a photo ID receipt, which will be good for as long as the verification process takes. That free receipt can only be lost upon finding that they're not eligible, that they committed fraud in the application, that they voluntarily withdrew from the application process. For example, let's say they moved out of state, they're not interested in getting that ID anymore, or they didn't respond one time in six months to reasonable inquiries. Now the Western District didn't like that system, and the Western District ordered two changes. First, it said the DMV must give that eight-year card right away, even if we can't verify who the person is. And second, the court said that we can't take that eight-year card away unless we finally determine that they are not eligible. Now the district court system doesn't improve from the point of view of voters' rights because it's only triggered if a person initiates the IDPP process. Now our system already gives that person a free ID upon initiation. On the other hand, the Western District system is significantly worse from the point of view of the state's legitimate interest in deterring fraud and in enhancing public belief that the system works. And that's because if the state is forced to give someone an eight-year ID right away, even if we can't verify them, we can't do a reasonable verification process. And I'll give the court two examples of the kind of follow-up questions we like to be able to ask. Sometimes we're not finding matches based on what they told us, but there seems to be an agency that might have some records on them that could help us determine if they are who they say they are. But a lot of those agencies won't release to us any information unless the person, the subject, gives their consent. If they don't have to get back to us, we have no mechanism to get that consent. Let me give the court another example. Sometimes we'll do a search, we'll talk to family members, etc., etc., and we'll find some census records. The census records will have someone with the same unusual first name but a different last name. So we'd like to be able to talk to the candidate, say, could that other person, could that actually be you? Could you maybe have been adopted, or maybe you had a stepfather, or you changed your last name? Under the Western District system, there's really no way for us to get that kind of contact. And I'll just make... So the distinction between the existing system and the remedy that the court ordered is that the existing system is, issues a certificate for voting that is revocable under certain circumstances, and the district court system issues a fixed duration credential for voting that is irrevocable during that duration? Well, they're both revocable, but the basis for revocation is critical. Both are irrevocable for a final finding of ineligibility. The problem is under the Western District system, and it's really, it's a very small difference, but it's a big one practically, is that it's not revocable for failure to communicate. That's very important, because if it's not revocable for failure to communicate, we have no meaningful way to do the verification process. And if we can't do a verification process, we can't ensure that the person is not a fraudster, and we can't let our citizens know that we've done a meaningful verification process. Okay, so the two systems diverge based on the permissibility or the practical effect of being able to verify identity and residency. That's right, and it is, most of it is the same, and I think it's telling that when the district court looked at the system and the problems that the court found, what was happening before May 2016, the district court adopted a remedy that was very close to the same thing that we had seen and we adopted. Now, I'd like to make one final point before I sit down here. It is clear from the briefing in this case, the plaintiffs believe that the district court orders something broader, that the district court orders some sort of unspecified fundamental reform to our system. We would ask the court to just clarify its opinion, if you could, that there is no roving authority for the district court to enact fundamental reform or otherwise without specifying what they are. That the two things that the district court concluded, those are either legally sufficient or not, but that there's not this other free-floating authority. Thank you, Your Honors. Thank you, Counsel. Mr. Walsh. May it please the Court, Ryan Walsh on behalf of the State of Wisconsin. The Constitution grants state legislatures broad discretion to set the times, places, and manner of holding elections. Now, pursuant to that discretion, Wisconsin could have enacted and set up a voting regime that more or less resembles the traditional model, requiring, for example, voters to show up on election day to vote and to register in advance of election day. Instead, Wisconsin has exercised its constitutionally conferred discretion to create one of the most generous, voter-friendly systems in the nation. Consider that many states offer no early voting, and 20 states require voters to have a special excuse to vote absentee. Wisconsin, meanwhile, allows voters to cast an absentee ballot for any reason up to two weeks in person, absentee, or if the person would prefer not to make the trip, they can cast an absentee ballot through the mail up to 47 days before the general election. Again, no excuse necessary. And while 37 states require voters to register in advance of election day, which a rule that undoubtedly deters some from voting, Wisconsin permits electors to register the same day they vote, and we already know from Frank One that registering to vote in Wisconsin is easy. Despite these and numerous other accommodations, plaintiffs would have this court take a red pencil to no fewer than 15 provisions of Wisconsin's generous election code. On the remarkable theory that that system denies or abridges the right to vote in violation of the Constitution and the Voting Rights Act, plaintiff's theory fails at every turn. I'll address the Anderson-Burdick framework first, then turn to the Voting Rights Act, and then the 15th Amendment and the intentional discrimination theory. A few basic principles dispose of plaintiff's Anderson-Burdick theory altogether. In a facial challenge under Anderson-Burdick, plaintiffs face a steep climb. Crawford holds that even if some voters cannot vote without undue effort, quote, that conclusion is by no means sufficient to establish plaintiff's right to the broad remedy that they seek here, namely an across-the-board injunction that would prevent the state from applying the election law even to those voters for whom there is no unreasonable or undue effort. A plaintiff instead must show that the law's broad application to all voters is unjustified. The district court overlooked this critical point repeatedly. About the durational residency rule, for example, the district court said, frankly, that plaintiffs could not show how many voters could not comply with the new law. Quote, plaintiff's expert could not pin down how widespread the problem is. Nonetheless, the court threw out the provision on its face, entering an across-the-board injunction on the grounds that the rule imposed moderate burdens on those whom it burdened. With respect, that is not a holding that withstands scrutiny under Crawford or Frank. Secondly, plaintiffs in the district court also misunderstood what I will call the numerator question in an Anderson-Burdick facial claim, whereas the denominator is the number of voters to whom the law applies, which is often the state's entire electorate. The numerator is not the number of voters who face an inconvenience under the law or even face a hardship under the law. Rather, the numerator is the number of voters who, because of the challenged law, cannot with reasonable effort cast a ballot in Wisconsin. So to illustrate, a voter who wishes to cast an absentee ballot 30 days in advance of election day or maybe three weekends before election day would have to show under Anderson-Burdick, for example, that casting a ballot by mail 47 days in advance of election day, collecting a stamp, would be too much effort, would be an undue effort on their part. And on that basis, that plaintiff in particular would have an as-applied claim under Anderson-Burdick. It's just as important to see what the constitutional right to vote is not in this case. Anderson-Burdick is not a ratchet. It is not an anti-retrogression standard. The right does not equal whatever a voter's options are under an election system the minute before the challenge law is enacted. If that's what it meant, there wouldn't be one constitutional right to vote. There would be 50. There would be one for every state, and that right to vote in each state would be constantly changing with every minor adjustment to a state's election code. Yet that is the position that plaintiffs' argument, if accepted, would necessitate. This is clear in their response to the case of Griffin, a very important case for resolution of this appeal. In Griffin, this court considered a challenge to an absentee voting statute. Working mothers argued that although Illinois allowed absentee voting under certain circumstances, there was no statutory circumstance that covered their hardship. The court assumed that many other people found themselves in the same boat. It's hard to vote on election day sometimes, given personal circumstances. Nonetheless, the court said it is obvious that a federal court is not going to decree all-mail voting, weekend voting, multi-day voting, or internet voting, or some other broad remedy that is tailored to the particularized hardships of each voter. Now, plaintiffs' response is telling. Their position is essentially that if Illinois had an absentee voting system like Wisconsin's, but then changed to the absentee voting system that Illinois had in the case, it might have come out differently. So again, it becomes a weird ordering issue under Anderson-Burdick. A third problem under Anderson-Burdick in the district court's opinion is what I'll call the Monroe principle. The Socialist Party versus Monroe case establishes that states are allowed to address potential deficiencies in their election system with foresight. They don't need to build a file. They don't need to collect evidence. And when those basic, reasonable, non-discriminatory election rules are challenged in court, they don't face a sufficiency of the evidence standard. They have no burden of proof. Their obligation is simply to point to their interests. Now moving to the Voting Rights Act claim, we know from Frank one what the general framework is. First, the plaintiff must show that the law provides less opportunity for voters on account of their race, not when considering the challenge law in isolation, but under the state's, quote, entire voting and registration system. And that difference in opportunities must amount to something like a substantial burden, that certain racial groups are less likely to use an equally open opportunity does not violate Section 2. If the state doesn't make it needlessly hard to cast a ballot, then it has not denied or abridged anything. Plaintiffs fail under this first basic step under Section 2 for two reasons. First, although a disparate outcome wouldn't show a denial or abridgment, plaintiffs haven't even showed that with respect to the absentee voting laws. Consider what we know. Between 2010 and 2014, the important laws to compare here because both are midterm elections and most of the challenge laws were enacted in between that period, turnout surged, turnout among African-American and Hispanic voters increased considerably as well, meanwhile African-American and Hispanic voting age populations increased significantly as well, and the percentage of the electorate that voted absentee increased, and the absentee voting rates among African-American and Hispanic voters increased as well. This is not a picture of a disparate outcome. What was that evidence based on? Several of those figures come from expert reports on both sides. In other words, the experts on both sides agreed about turnout generally and turnout among African-American and Hispanic voters as well, but then we also had a statistical analysis done by Dr. McCarty from Princeton University who looked at the numbers and made calculations on the basis of them. That's it. But I have some question on how you know the race of people voting. The state does not collect racial information. That's right. But Dr. McCarty was able to use through, I think, through surveys and get a general sense of what the racial groups were. Second and more to the point, isolated racial disparities wouldn't make out a Section 2 violation anyway. Under Frank I, courts must evaluate plaintiff's options under the state's entire voting system. If the district court had seen this point, it would have held for the state. We know this because it identified the outcome-determinative point. The challenge provisions, quote, neither categorically bar individuals from voting nor close the window in which municipalities can offer in-person absentee voting. Indeed, quote, if the shortened period is not convenient for certain voters, then they can vote using mail-in absentee voting or on Election Day. In any event, there are no conditions allegedly giving rise to any underlying disparities that are themselves attributable to discrimination by the state of Wisconsin. The district court in this case repeated the errors of the district court in Frank I. Finally, unintentional discrimination. It is extremely difficult, as it should be, to prove that a legislative body acted with any intent, let alone an intent specifically to cause invidious harm to voters on account of their race. Now, Arlington Heights sets forth the relevant factors. First, we would want to know if there's some kind of discriminatory effect. For the reasons I just gave, there has not been that effect with respect to the in-person absentee voting statutes. What was the historical background? Well, in Wisconsin, the background is one of the most voter-friendly election regimes in the country and a history of state action that doesn't include the kind of intentional facially discriminatory laws that maybe some other states that have been covered by the Voting Rights Act traditionally have. Was there any question in the sequence of events, or were there any procedural departures preceding enactment of these laws? Plaintiffs actually conceded that there were not procedural departures. Were there any substantive departures? Plaintiffs' main argument is that, well, some of these laws weren't robustly justified. They weren't accompanied by statements of legislative fact-finding or statements that these laws would serve these particular interests. Well, with respect, many of them did come with statements of general purpose, and in any way, the substantive departure factor doesn't demand that much. They basically rest their argument on the legislative history factor. They find a few quotes from a few legislators that they think are racial comments. On their face, they aren't racial comments. And anyway, a couple comments from a couple legislators is a far cry from intent on the part of the entire legislative body. Plaintiffs' argument on intentional discrimination seems to boil down to this. Harming racial minorities was in the Republicans' interest, and they had the opportunity to This overlooks not only that Act 23 and three other acts in this case were passed with Democratic support, Act 23 being the source of seven of the provisions challenged here. It also overlooks that the One Location Rule, an act in 2005, was also passed with Democratic support and signed by a Democratic governor, Jim Doyle. More fundamentally, it misses that partisan motivation is not racial discrimination. Partisan motivation is often at least part of an intent behind any law, as this court recognized in Frank, and as Justice Stevens recognized in Crawford. For these reasons, we think there is no possible severe burden, much less a moderate one under Anderson's verdict. There is no denial or abridgment under Section 2, and there is no evidence of intentional discrimination with respect to any of these laws. If there are no questions, I will take my seat. Certainly, counsel. Good morning, Your Honors. Good morning. May it please the Court. My name is Bruce Baiba, and I represent the appellees and cross-appellants. I think I'll start with the discussion of intentional discrimination and then move to the IDPP process, and then, if time permits, talk about Section 2 and Anderson's verdict. This is one of those rare cases where there are actually direct statements going to discriminatory intent. The Arlington Heights case really is all about the fact that, and that was decided, of course, in 1979, but the Court said in those days that you would rarely expect to hear explicit statements of racially or age, and also, in this case, discriminatory intent from the legislators who were passing the law, and so you have to do a broader, sensitive analysis, the Court said, looking at all of these other factors, most, if not all, of which we also met, I think, in this case, but this is a case where you have a number of these extraordinary statements, which I'll get to in a minute. We think the District Court was correct in finding that the cutbacks to the in-person absentee voting were motivated by race and, therefore, unconstitutional, but we do think that Judge Peterson made some legal errors that led him to conclude that there was not intentional discrimination with respect to the rest of the provisions at issue, and just briefly, I'll summarize. First, the Court considered each of the provisions individually, not collectively, and evaluate them as a group. Even with respect to Act 23, which was passed as kind of an omnibus bill in 2011, it went and it contained some 15 provisions, even in that act alone, the Court went provision by provision, not seeing the relationship among them, and this was one of the fundamental errors made by the McCrory District Court, which was overturned by the Fourth Circuit, that it kind of missed the forest for the trees, is how that Court put it. Second, the Court applied a rational basis analysis in many places to the challenge provisions, rather than analysis for pretext, evaluating whether certain rationales could have been, the underlying decision, and as, again, I hearken back to McCrory, I think Arlington High School is of course- Counsel, let me tell you what my worry is about the District Court's basic finding of discriminatory intent. The judge seemed to say that his principal concern was that at least the in-person absentee voting rule had a disparate impact on blacks. The state knew it, and the state therefore intended to discriminate. Is that a fair summary of the core of the ruling? I think it's a fair partial summary. I think there was more. I mean, there were explicit statements in the legislative record. Okay, yeah, put the explicit statements to one side. My problem is that that was rejected by the Supreme Court in personnel administrator of Massachusetts against Feeney as a ground for finding discriminatory intent. If that's the only thing you have, Your Honor, I think that, but I think we're far away from that case. Sorry, I didn't mean to interrupt. Did you, Your Honor, was Your Honor done with your question? Well, then you really are saying your whole intent argument boils down to statements made by legislators. Because otherwise, we've just got a District Court who didn't cite Feeney, didn't try to apply the Feeney standard, and used a standard that I find very difficult to reconcile with the Supreme Court's. Well, I think the court applied Arlington Heights. I do think, as I said, I think it made some errors there. But Feeney is a later decision, much more specific, right? I don't know whether you know the history of it, but after Arlington Heights, the three-judge District Court in Feeney said, people intend the natural and probable consequences of their acts. Therefore, knowledge of disparate impact is discriminatory intent. And the Supreme Court said, that's wrong. Right, and we're far from that, Your Honor. That's not all we have by any means here. We not only have explicit statements, but they're not explicit, as you describe it. Do they actually do that? Well, yes, Your Honor. They have an inference. Well, I mean, Your Honor, there are several statements, particularly going back to the in-person voting, going back to Act 23. And this was not some backbencher. This was one of the leaders of the committee, one of the Senate leaders, Mary Lazik, Senator Mary Lazik, who said, in response to some senators having some qualms about this act, part of which cut back on in-person absentee voting, we've got to consider what this will mean for the neighborhoods in Milwaukee and the college campuses around the state. And then Senator Groffman, now Congressman Groffman, spoke up and said, yes, all I care about is winning, and the Democrats would do this, too, if they were in power. Now it's true that she doesn't explicitly say, when she says neighborhoods around Milwaukee, she doesn't say black people, but that, you know, that's the inference you want to draw. Well, it's hard to draw any other inference, Your Honor, and she explicitly references college towns. So she actually does make an explicit reference with respect to age. And there's more. There are more states. How does a reference to college towns sound like a code word for race? No, that goes to age, Your Honor. We have a 26th Amendment claim as well, and part of what the legislature has done with many of these provisions is to target young people, particularly college-age students, with various provisions that make it harder for them to register and to vote. And so that was an explicit reference to that kind of targeting. What was the basis on making it difficult for younger people to vote? What was your basis for that? Well, in that instance, in terms of the statement, she said, we've got to think about what this will mean in the college towns around the state, but there are also a number of these provisions. Well, the innocent inference is that a lot of people attending college in Wisconsin are not residents of Wisconsin, and therefore, one has to be very careful about who registers and votes in college towns. Why isn't that the most straightforward way to understand a statement like that? It is possible, Your Honor, but again, I think that all these things under Arlingtonites need to be considered together because you also have several provisions which are specifically aimed at college students. You have basically one of the provisions in this kind of package that was passed over the period between 2011 and 2014, basically made all student IDs useless as a form of ID. The dorm lists were essentially made unusable as a way to verify residency because the college had to specify who was a citizen and who was not, and federal law actually prohibits them from doing that, and so they wouldn't provide the dorm lists anymore. There are several provisions like this that are specifically targeted at young people, and there's more, Your Honor, going back to your question, Judge Easterbrook, it's not just the statements. In addition, the justifications for these measures are meager, and while it's true, it's not like the state has to build a record every time it makes a change. When there's an exemplary system, election system, and a swath of changes are made in a short period of time, which cause harm, cause burden on the one hand, and there's very little justification on the other, that goes to pretext, which is another factor under Arlington Heights. Pretext for what? You know, a large part of your brief, one thing that worries me about that, a large part of your brief reads as if the argument is, when Democrats are in control, they're free to expand voting. When Republicans are in control, they're prohibited from making any pro-Republican changes. That can't be right. Well, Your Honor, we also have a question. Why are the standards when Republicans are in control any different from the standards for changes when Democrats are in control? That's not my, that's not our position, Your Honor. I mean, partisanship should have nothing to do with how easy or hard it is for qualified citizens to vote. In fact, our position is, under Carrington v. Rash and Veith and other cases, is that that's unconstitutional. And actually, you know, this came up particularly in the discussion of the durational residence requirement. Wisconsin used to have a longer one, then it had a shorter one, then it had a longer one again, and the district judge said, no, you can't change back to the old longer one, even a longer one that's been approved by the Supreme Court of the United States, because you can't demonstrate that the other, that the shorter one was a disaster. I mean, that just says, district judge says, I'm taking this out of politics, I'm going to decide it. Well, the judge did a very sensitive analysis, and that, you know, was under... How was it a very sensitive analysis to hold unconstitutional something the Supreme Court of the United States has twice held to be constitutional? It didn't say... District judges aren't supposed to disagree with the Supreme Court of the United States. I mean, the cases you're referencing, Your Honor, involved balancing tests. They did the type of, you know, hard decision that the adversarial process demands, in the words of the Crawford opinion, and so too did this judge. He looked at the fact that there was no real reason for the change from 10 to 28 days. He looked at the fact that you had this kind of nonsensical situation where if you had moved between 28 and 10 days within Wisconsin, the only way you could legally vote was to go back... Look, Marston v. Lewis holds that a 50-day durational residence requirement is valid. Wisconsin moves from 10 days to 28, and by my count, 28 is a lot less than 50. Yes, it is. How can a 50-day requirement be valid, but a 28-day requirement be invalid? In Marston v. Lewis, the state proffered a rational justification for that registration period. It had a need to process. It used volunteer registrars, and so it had a special need to have additional time to correct mistakes. There was a very... It wasn't just 50 days is fine and anything above 50 days is not fine. There was an analysis and a balancing that went on in that case. No, one would think from Marston that 50 days is fine, and maybe 60 days is too. You have an awful hard time reading Marston to say 50 days is fine, but 28 days is prohibited. Well, again, there were specific reasons, and by the way, it wasn't a change. There was a challenge to their existence. You see, that's one of the reasons why I'm worried about the rationale, the brief, because it amounts to saying, well, an earlier Wisconsin legislature thought that 10 days was fine, and that ties the hands of a later legislature. Different political party gets into power. Their hands are tied. The hands of the legislature were not tied. They could always change from 30 to 10, but they can't change from 10 to 28. They are not categorically prohibited, Your Honor, but they do have to have a rationale, and when the rationale appears to be either race or partisan advantage, I submit that's unconstitutional. Why is a rationale concerning partisan advantage unconstitutional? If you're making it part of it. What decision of the Supreme Court has said that making decisions based on partisan views violates the Constitution?  I would point to Justice Kennedy's concurrence in Vieth, and I would also point to decisions like Elrod v. Burns, which are not, it was an election decision. Elrod has nothing to do, nothing conceivably to do with this. Well, Your Honor, the district court here found. Elrod had to do with people who were being fired because of their speech. You're right, and because of their political affiliation. In that case, they had supported the competing sheriff in that race. So in your view, the Supreme Court has already held that partisan gerrymandering is unconstitutional? No, Your Honor. That's the classic form of making decisions for partisan reasons. Well, actually, my position, Your Honor, is that the Supreme Court has acknowledged that partisan gerrymandering is unconstitutional, but has not found a standard to judge it by yet. That's what I think the meaning of Vieth is. Do you think it would violate the Constitution if Congress says we're reducing the level of benefits in the food stamps program because the people who get food stamps largely vote for our opponents, so we're cutting those benefits. We're going to increase benefits for our supporters and reduce benefits for our opponents. Violation of the Constitution? Yes, Your Honor. And what Supreme Court case would you rely on for that proposition? I would rely on Elrod v. Burns, but I wouldn't. Elrod v. Burns gives you no purchase. What case do you seriously rely on? Well, can I address the partisan gerrymandering point, Your Honor? Because there, actually, the court has said some partisanship is OK. What we haven't been able to determine is how much is too much, right? Here, we're talking about whether somebody's ability to vote or register to vote. There is no case in which the court has indicated that you can make it harder for a group of people to register and vote based on how you think they're going to vote. In fact, that's what Carrington v. Rash said. They said you can't put fences around the ballot box based on the way you think a group of people is going to vote. There it was the military. But it can't be more acceptable to say, well, we want to try to keep people who vote Democratic from the ballot box, and we're going to try to put barriers in their way. That's a far stronger case than Veith, the partisan gerrymandering case. And in fact, just last term, Justice Scalia stated in Shapiro v. McManus that a majority of the court had not disavowed or disagreed with Justice Kennedy's rationale in Veith. So I think it's alive and well. It seems to me almost self-evident that you couldn't target, as a matter of equal protection, you couldn't target Democrats and you couldn't target Republicans to try to make it harder for them to vote. And the one thing I would mention is that the district court here found, although it didn't, it also, like Your Honor, did not buy our partisan gerrymandering claim, it made an explicit factual finding that these laws were intended to target Democrats. And I think where it erred is the next question is, well, how? How did they target Democrats? Because they target the people who vote Democratic, African-Americans, Hispanics, young people. Wait, wait, wait, wait. You mean African-Americans always vote Democratic? They don't vote Republican? No, Your Honor. That's not what I'm saying. I think this last election may have changed that theory as well. Well, not much, Your Honor. I mean, African-Americans voted like 90% for the Democratic candidate. By what survey do you make that statement? Pretty much any survey, Your Honor. I mean, it certainly wasn't any lower than 85%, okay? And it certainly, in the record, there's lots of data that Latinos and African-Americans in Wisconsin vote predominantly, overwhelmingly for the Democratic Party, as do younger voters as well. And so that's how they accomplished the targeting that the district court found was to target those groups. And the district court did a sensitive analysis and went through each of these provisions and talked about the ways in which they were. Again, I'll get back to the question I asked your point. That's by survey. Obviously, you don't ask those questions at the time they vote. Oh, yes, Your Honor. I'm glad you reminded me because I wanted to answer that question. We actually had an expert who basically estimated. There is a scientifically acceptable methodology for estimating the race of a voter file. Essentially, you can do it for any group of people. There's like a formula. It's based on name and other factors. And he did that analysis. And so it's proven to have a high degree of accuracy, and the district court credited it in this case. But Wisconsin doesn't maintain race on its voter file. You're quite right about that. And so maybe I should – I've talked about intentional discrimination. I should probably talk about the IDPP process because I think my time is maybe running short. You know, the district court here found correctly that the IDPP is a wretched failure, and the district court's words, a complicated beast of a system. It's just not accurate by any stretch of the imagination to say that the state was – Based on – those findings were based on testimony about the pre-May 2016 program. The pre, the post, the up to today IDPP, Your Honor. I mean, the state was – It was all based on anecdotal evidence about lapses in the program before the emergency rule, as I understand it. Well, the emergency rule did not – depends on which emergency rule, Your Honor. The last one. But the emergency rule that they came out with, like, the Friday before the trial started on Monday, didn't begin to fix the problem. And, you know, we have in the record scores of people who were literally disenfranchised because they were caught up in that process, because they had certain letter differences in their name between, say, a Social Security record and their birth certificate. This was a systemic problem, and it particularly affected African Americans and Latinos. In the record, there's a poster board where you can see the 60-some people who were initially denied, and many of them were caught for years in that system, and almost all of them are black and brown. And even after they announced this emergency rule, there were several problems. One, they continue to only issue these temporary receipts, which continues to burden individuals who are caught up in this process, because many, if not most of them, have come to the DMV with all the documentation they have. And what that means is they receive a contact. In fact, our clients received a contact last week saying, you know, we need to hear from you. We want to get more documentation from you, a family Bible, you know, something that will verify your birth, even though the DMV administrator has admitted with these folks that there's no dispute that it is more likely than not. It's probably more likely beyond a shadow of a doubt, Your Honor, that they are who they say they are, that they are U.S. citizens and that they are Wisconsin residents with a constitutional right to vote. And yet they've come with all the documentation they have. And this court, sitting on bonks, said that's what needed to be done to have an adequate safety valve. And they're still being required to somehow come up with something else, even though they've already come with everything they have. And the receipts are at some point going to run out. I mean, they, you know, it's burdensome in and of itself to have to keep making these calls. I mean, the court found, the district court found that the average number of contacts was like five or six contacts. Some people, many more contacts than that. I mean, these are really, I mean, severe burden is really way too mild. But is the right to vote being burdened if the credential remains valid? Well, it could be. That's the material question. Right. Well, there are a couple of things on that, Your Honor. One, they lost some people, right, in this process. I mean, there are some people they lost track of. And, you know, some people were denied, were initially denied. And then they later, through this emergency rule, said, well, we're going to take the denial back. But they couldn't find a lot of those people. And so those people are still being burdened. These individuals have to keep, unlike most citizens in Wisconsin, they have to keep contacting the DMV to show them God knows what to try to get a permanent ID. In some instances, they're demanding that people fill out a change of name form, even if it's the same name that they've used, like Johnny Randall is one of the plaintiffs, you know, 75 years old. It's the same spelling that he's used. And they want him to sign a form under penalty of perjury stating that his new name. But is there any evidence that anybody's been denied the right to vote? Yes, Your Honor. Scores of people have. Yes. Under the new system with the credential that automatically issues and cannot be revoked except for fraud. Well, there is. That has not happened, Your Honor, because the district court stayed. First of all, it was never an irrevocable credential. The district court's order initially said you have to make it as permanent as a driver's license or a regular ID. That's based on an old system that no longer exists. The remedy addresses circumstances that don't exist anymore. Well, there is no remedy yet, Your Honor. What's in place right now is they are sending. Well, I know it's been stayed, but the district court did order a remedy and certain reforms to the process based on an evidentiary record about a system that no longer exists. Yeah, unfortunately, the system does still exist and. No, I mean the emergency rule puts in place this temporary credential that is temporary only in the sense that it allows the state to investigate identity, proof of identity, and proof of residency, but it doesn't expire. It does, Your Honor. It does. The state wants it to be a 60-day receipt. It's now, by order of the court, a 180-day receipt, but it does expire. Now, they have said that that will be renewed, but they put all of these conditions on it. You have to keep in contact, even if you've provided all the documents. It automatically renews unless there's no contact or fraud or a finding of ineligibility. Well, it automatically renews as long as the person stays in contact, and so if the DMV, as they have done, sends you a letter and says, you know, we want to keep working with you. Sorry, I don't know if that means my time has expired or if that. You've got time. Okay. You know, we want to keep working with you, but you need to find these documents, which they have done, and the person has already given all the documents they could give, and the DMV has already run very lengthy personal reports. But it still doesn't expire, though. It does, Your Honor. It does expire. It expires in 180 days by order of the court, and it will only be renewed if you stay in contact with the DMV and answer these unanswerable queries and your address is up to date. These are burdens that are not put on most residents of Wisconsin. If you can go and get a driver's license or you can go and get a Wisconsin ID, you've got it for eight years, and you don't have to keep answering queries when there's no dispute that these people, most of these people, all of these people. How many people? Well, in terms of the IDPP, Your Honor. Are we talking about what you're describing? Sure, sure. In terms of the number of people who have now used the IDPP, that's 3,000 people. In terms of the people who, and I'm basing that off of the declaration we received recently. As of May 13, 2016, which was the Friday before trial, 1,389 had used it. Many of those, and the numbers are in our brief, but I can give them to you here too, were stuck, as Judge Peterson said, were stuck and stuck hard in the process. They were either outright denied, which that number is at least 60. I think it ultimately was many more than that. And others were suspended, so they didn't outright deny them, but they kind of stopped trying to do something to get them a final ID. Others gave up and left the system, and then they would code those people as having voluntarily withdrawn from the system. And one can understand why somebody might give up after talking to them for eight or nine times. 67.9% of IDPP petitioners are minority, compared to 12% of the citizen voting age population in Wisconsin. And so there's no question, and I know in Frank this court said, do minorities use the opportunity as much as non-minorities? And in fact here, minorities use it much more. The problem is they're getting stuck in it. And there are other statistics I could give you now if you wanted, but they're also in our brief, so I don't want to— You don't have to do that. But we're talking about 100 people? Just to be clear, Your Honor, 100 that were denied or stuck. Actually, let me just— Well, that's all right. There are more than that, I think, that are in the process right now. I don't know the exact number who are stuck. Go ahead with your argument. But just to be clear, our position, though, of course, is that the IDPP is just the tip of the iceberg of a very broken system. People are deterred from voting by this. People are deterred from trying to get the ID because it's a very burdensome process. Thank you very much, Your Honor. Thank you, counsel. Mr. Saitlin, anything further? Just a couple of quick points to clarify the record. The only people that have applied that don't either have a hard card or a receipt are those that voluntarily canceled the process because, for example, they moved out of state or passed away. That is the state of the record. And also, just to clarify how the system works, so you come in and you get your receipt. You get back to us every six months. We'll have reasonable follow-up questions. And let's say you don't want to get back to us. Let's say there's no election coming up. You don't want to work with us anymore. After six months of no contact, you'll get canceled. But the rule says that if at some point you do want to vote, just give us a call back. Answer some simple questions. The receipts will start issuing once more. So there's no gap, and there's no one being disenfranchised. And responding again to Your Honor's question, I think a remand would be entirely appropriate for us to show how the system is currently working. Thank you. Thank you very much. Counsel, the case is taken under advisement.